**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WELLPOINT HEALTH NETWORKS INC. and UNICARE LIFE & HEALTH INSURANCE COMPANY, )))) | |
| Petitioners, ) | |
| ) | Case No. 1:07-cv-00943 |
| v. ) | |
| ) | Hon. Mark R. Filip |
| JOHN HANCOCK LIFE INSURANCE ) COMPANY, ) | Magistrate Judge Schenkier |
| Respondent and Cross- ) Petitioner, ) | |
| v. ) | |
| ) | |
| WELLPOINT, INC., WELLPOINT ) HEALTH NETWORKS INC., and ) UNICARE LIFE & HEALTH INSURANCE ) COMPANY, ) | |
| ) | |
| Cross-Respondents. ) | |

**DECLARATION OF MARK J. LEIMKUHLER IN SUPPORT OF**
**JOHN HANCOCK LIFE INSURANCE COMPANY'S APPLICATION**
**TO VACATE ARBITRATION AWARD AND IN OPPOSITION**
**TO PETITION TO CONFIRM AWARD AND INTERIM RULINGS**

I, Mark J. Leimkuhler, hereby declare as follows:

1.       I am an attorney admitted to practice in the District of Columbia, and I am

a partner in the law firm of Baach Robinson & Lewis PLLC in Washington, D.C.

2.       I submit this declaration to place before the Court certain facts and

documents relevant to (i) the application of John Hancock Life Insurance Company

("John Hancock") under section 10(a)(4) of the Federal Arbitration Act (the "FAA"), 9

U.S.C. § 10(a)(4), to vacate the Award rendered on April 23, 2007, as revised on May 21, 2007 (the "Award"), in an arbitration between John Hancock and WellPoint Health Networks Inc. and UniCare & Life Health Insurance Company (together with WellPoint, Inc., "WellPoint"), and (ii) John Hancock's opposition to WellPoint's Second Amended Petition (the "Petition") to confirm both the Award and the Interim Rulings on Phase I issued on May 24, 2006 (the "Interim Rulings") in the arbitration. My firm and I represented John Hancock in the arbitration and in connection with the dispute between John Hancock and WellPoint that led to the arbitration.

**The Parties**

3.      John Hancock is a life insurance company incorporated in Massachusetts, with its principal place of business in Boston. Since April 2004, John Hancock has been a subsidiary of Manulife Financial Corporation.

4.      On information and belief, WellPoint, Inc. is the successor to WellPoint Health Networks Inc. ("WellPoint Health"). WellPoint, Inc. was formed in November 2004, when WellPoint Health merged with another health insurer, Anthem, Inc. Anthem, Inc., the surviving entity in the merger, then changed its name to WellPoint, Inc. These facts are set forth on the website of WellPoint, Inc., and reprinted pages from that website are attached as Exhibit 1.

5.      On information and belief, UniCare Life & Health Insurance Company ("UniCare") is a wholly owned subsidiary of WellPoint, Inc. Prior to the 2004 merger and formation of WellPoint, Inc., UniCare was a wholly owned subsidiary of WellPoint Health.

2

### The GBO

6.      Until 1997, one of John Hancock's insurance businesses was its Group Benefits Operations (the "GBO").  The GBO was a business unit of John Hancock whose primary function was to provide group insurance coverage, including group health, disability and accident business and related services.  The GBO was not separately incorporated.  At the time of the GBO Sale, the GBO had about $3.4 billion in annual gross premium and premium equivalents.

7.      As one small part of its business, the GBO provided insurance and reinsurance underwritten for it by independent contractors pursuant to Underwriting Manager Agreements ("UMAs") with James E. Hackett Reinsurance Corporation ("Hackett") and Fiduciary Administrative Services Company ("FASCO").  Pursuant to its UMA, Hackett wrote reinsurance business on behalf of John Hancock, including reinsurance of medical and personal accident coverage.  FASCO, pursuant to its UMA, wrote student life, medical and accident insurance on behalf of John Hancock.  John Hancock was obligated to make payments for valid claims under insurance and reinsurance contracts underwritten on its behalf by Hackett and FASCO, and in return it received benefits in the form of fees and premiums.

### The Underlying Dispute

8.      In 1997, John Hancock sold assets and transferred liabilities relating to the GBO to WellPoint.  This sale (the "GBO Sale") was implemented through several agreements, including a Purchase and Sale Agreement ("PSA"), a Coinsurance

Agreement, and an Administration Agreement. Copies of the PSA, the Coinsurance Agreement and the Administration Agreement are attached as Exhibits 2, 3 and 4, respectively. These three contracts are referred to collectively herein as the "Transaction Agreements."

9.      The parties agreed to arbitrate disputes that might arise in connection with the Transaction Agreements. This agreement to arbitrate was set forth in Article 15 of the PSA (the "Arbitration Agreement"). The terms and conditions provided in Article 15 of the PSA were incorporated into both the Coinsurance Agreement (at Article XIV) and the Administration Agreement (at Article XIV).

10.      The GBO Sale closed on February 28, 1997. After the closing, John Hancock incurred very substantial losses and expenses from the Hackett business and the FASCO business, and it is continuing to incur losses and expenses from the Hackett business. John Hancock estimates that the total of its past and future losses and expenses from these businesses could exceed $1 billion, exclusive of interest.

11.      John Hancock's position is that, under the terms of the Transaction Agreements, WellPoint is obligated to reimburse John Hancock for John Hancock's losses and expenses arising from the Hackett and FASCO businesses, and WellPoint is liable for breach of contract because it has refused to make those payments to John Hancock. Under the Award, John Hancock is entitled to recover only a small portion of the amounts to which it believes it is entitled. The difference, amounting to hundreds of millions of dollars, is the amount at issue on John Hancock's application.

**Demand for Arbitration**

12.     On October 16, 2002, WellPoint sent to John Hancock a Demand for Arbitration (the "Demand") asserting, among other things, that WellPoint had no obligation to pay John Hancock for losses and expenses from the Hackett business.

13.     On November 27, 2002, John Hancock sent to WellPoint a Counterdemand for Arbitration (the "Counterdemand") in which John Hancock asserted, among other things, that WellPoint is obligated under the Transaction Agreements to pay for the losses from the Hackett business and the FASCO business, and for the expenses of administering those businesses.

14.     On January 28, 2003, WellPoint sent to John Hancock a Reply to the Counterdemand ("Reply").  Copies of the Demand, the Counterdemand and the Reply (without the documents that were originally attached to the Demand and Counterdemand) are attached as Exhibits 5, 6 and 7, respectively.

**Appointment of the Arbitrators**

15.     The Arbitration Agreement provides for "ad hoc" arbitration of disputes. It does not provide that arbitrations between the parties will be governed by rules established by an organization that administers arbitrations, such as the American Arbitration Association (the "AAA").

16.     The Arbitration Agreement sets forth the parties' agreement for initiating and conducting an arbitration, including, in section 15.3, the method for the appointment of arbitrators.

17.     On November 6, 2002, WellPoint gave notice that it had appointed David J. Nichols as its party-appointed arbitrator "[p]ursuant to Section 15.3 of the [PSA]."  On November 14, 2002, John Hancock notified WellPoint that it had appointed Donald T. DeCarlo as its party-appointed arbitrator.  Copies of these letters are attached as Exhibits 8 and 9.

18.     The party-appointed arbitrators did not agree on a third arbitrator (referred to in this proceeding as the "Umpire"), and in January 2003 WellPoint asked the Denver office of the AAA to appoint one pursuant to the Arbitration Agreement.  Copies of correspondence to and from the AAA relating to the selection of the Umpire are attached as Exhibits 10, 11, 12, 13 and 14.  The AAA initially appointed Lawrence O. Monin as the Umpire in June 2003, but WellPoint objected because Mr. Monin had been appointed by John Hancock to serve as an arbitrator in other proceedings.  John Hancock did not oppose WellPoint's objection.

19.     On August 5, 2003 the AAA appointed Richard S. Bakka as the Umpire. As of that date, the panel for the arbitration (the "Panel") was fully constituted, in accordance with the terms of the Arbitration Agreement, and the arbitration proceeded.

## Pre-Hearing Proceedings before the Panel

20.     The Panel held an organizational meeting in September 2003, at which it established general procedures for the arbitration, ruled on initial procedural issues, and heard from the parties regarding their substantive positions.  During the period from September 2003 to August 2005, the Panel convened three in-person hearings and numerous telephone hearings on a variety of disputed issues.  The Panel's deliberations

led to eight sets of rulings that the Panel styled as "Interim Rulings." Copies of these eight sets of interim rulings by the Panel are attached as Exhibit 15.

21. There was no agreement between the parties requiring the party-appointed arbitrators to be strictly neutral. As is customary in reinsurance arbitrations, each of the party-appointed arbitrators had a dual role: in addition to being a member of the Panel that was expected to resolve fairly the dispute, he was permitted to put forward the positions being advocated by the party that had appointed him. As part of the latter function of the party-appointed arbitrators, each side was permitted to have *ex parte* communications with the arbitrator it had appointed, throughout the pre-hearing period up until the submission of the parties' hearing memoranda in February 2006.

22. In October 2003, WellPoint wrote to the Panel seeking the production of numerous documents from other confidential arbitrations involving John Hancock. John Hancock opposed those discovery requests. In late 2003 and early 2004, the Panel heard and resolved a number of disputes relating to this aspect of discovery. The Panel directed John Hancock to produce certain documents from other arbitrations, but only insofar as the other parties to those arbitrations consented to that production. In 2004 and the first half of 2005, the Panel actively supervised this "other arbitration" discovery process, and it heard and resolved a number of disputes concerning that aspect of discovery.

23. Broader discovery began in September 2004. During the first half of 2005, the Panel heard and decided numerous discovery disputes regarding document production, answers to interrogatories, depositions, and other pre-hearing matters. As of August 2005, document and interrogatory discovery had been largely completed, and

some depositions had been taken.  All remaining fact depositions were to be completed in September 2005.

24.     During the summer of 2004, John Hancock asked the Panel to schedule the final hearing in the arbitration.  On October 8, 2004, the Panel scheduled the final hearing for four weeks in March 2006.

25.     Long before August 2005, references had been made in the arbitration to the fact that a portion of the Hackett business had been written by Hackett's underwriter in Bermuda, Reginald Billyard.  Until late August 2005, however, WellPoint never asserted in the arbitration that the fact that some of the Hackett business was written in Bermuda or by a subsidiary of Hackett had any effect on the scope of WellPoint's legal obligations.

**WellPoint's Change of Counsel**

26.     In the negotiation of the GBO Sale, one of WellPoint's principal outside lawyers was Nicholas Williams of the law firm of Chadbourne & Parke.  At some point after the GBO Sale, Mr. Williams left Chadbourne & Parke and joined White & Case LLP.  White & Case LLP signed WellPoint's Demand for Arbitration and its Reply as WellPoint's counsel, and until the summer of 2005 White & Case LLP was WellPoint's sole outside counsel of record in the arbitration.

27.     In August 2005, WellPoint advised the Panel and John Hancock that it had replaced White & Case LLP as its counsel of record in the arbitration with LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf").

28.     On August 31, 2005, LeBoeuf sent a letter to me that purported to set forth WellPoint's legal ground for maintaining that it was not responsible for losses or expenses incurred from the Hackett business.  In that letter, WellPoint asserted, for the first time, that it had no obligation to pay for any losses or expenses from the Hackett business underwritten in Bermuda ("Bermuda Business") based on the contention that the Bermuda Business had been written outside the United States by a legal entity other than James E. Hackett Reinsurance Corporation.  The letter stated, in part:

> WellPoint's responsibility for "Hackett" business includes only that business written by James E. Hackett Reinsurance Corporation within the United States and not any business written by offshore affiliates, joint ventures, or other operations using different or similar names and operating outside the United States, Puerto Rico, or Guam.

A copy of LeBoeuf's August 31, 2005 letter is attached as Exhibit 16.

29.     Before August 31, 2005, neither WellPoint nor its counsel had asserted in the arbitration that the Bermuda Business was not part of the GBO Sale.  To the best of my knowledge, prior to that date neither WellPoint nor any of its representatives had stated this position regarding the Bermuda Business during the eight-plus years following the GBO Sale.

### WellPoint's Appointment of
### a Replacement Arbitrator

30.     In an August 17, 2005 email, a copy of which is attached as Exhibit 17, the Umpire stated that Mr. Nichols, WellPoint's party-appointed arbitrator, had advised him that WellPoint had asked Mr. Nichols to resign from the Panel and was seeking to name a replacement party-appointed arbitrator.  Over the following two months, the

parties and members of the Panel had frequent correspondence and conference calls on this subject, culminating in WellPoint's appointment of a replacement arbitrator on October 14, 2005. Copies of letters and printouts of email correspondence to and from the parties and members of the Panel on this issue are attached as Exhibits 17 through 39. (For the convenience of the Court, emails have in some instances been highlighted in the printouts of email strings that are attached as exhibits to this declaration.)

31. At first, Mr. Nichols did not accede to WellPoint's request that he resign. For weeks, while the parties debated the propriety of WellPoint's request that Mr. Nichols resign and whether WellPoint would have the right to name a replacement arbitrator if he did resign, Mr. Nichols remained on the Panel, as reflected in correspondence between the parties and the Panel. I understand from *ex parte* conversations with Mr. DeCarlo during that period that WellPoint's counsel initially approached Mr. Nichols to seek his resignation in an *ex parte* telephone call on or about August 16, 2006. Neither John Hancock nor, on information and belief, the Panel received any prior notice that WellPoint would be seeking Mr. Nichols' resignation. I further understand from *ex parte* conversations with Mr. DeCarlo that Mr. Nichols had advised WellPoint's counsel that he did not wish to resign but that WellPoint insisted that he do so.

32. On information and belief, during the two-week period after Mr. Nichols declined to resign from the Panel, WellPoint pressed its request in additional *ex parte* discussions with him. Mr. DeCarlo told me that Mr. Nichols reported that on August 29, 2005, WellPoint's counsel had called Mr. Nichols to ask him whether he was prepared to

withdraw from the Panel and that Mr. Nichols had responded that he was not prepared to do so. Mr. DeCarlo further advised me that, on the next day, August 30, 2005, Mr. Nichols advised the other Panel members that he had decided to resign. According to Mr. DeCarlo, Mr. Nichols explained to the other Panel Members on August 30 that he had concluded that he could not continue to serve on the Panel in the face of WellPoint's demands that he step down, and Mr. Nichols said he would resign even though, according to Mr. DeCarlo, the other members of the Panel asked that he remain on the Panel.

33. WellPoint never disclosed to John Hancock or, on information and belief, to the Panel why it sought Mr. Nichols' resignation. WellPoint never disclosed to John Hancock or, on information and belief, to the Panel what it said to Mr. Nichols during its *ex parte* discussions with him that overcame Mr. Nichols' resistance and caused him to resign from the Panel.

34. In August and September 2005, John Hancock repeatedly objected to WellPoint's efforts to procure the resignation of Mr. Nichols and WellPoint's appointment of a replacement arbitrator in a manner not provided for under the Arbitration Agreement. John Hancock asserted that WellPoint had no right under the Arbitration Agreement to seek Mr. Nichols' resignation or, if Mr. Nichols did resign, to appoint a replacement arbitrator.

35. On September 14, 2005, the Umpire sent an email (Exhibit 27), asking John Hancock to proceed with consideration of a replacement arbitrator proposed by WellPoint. In that email, the Umpire stated that "it is recognized that you have a continuing objection to the substitution," and that any consideration of or comment on a

replacement candidate by John Hancock would be "subject to" John Hancock's continuing objection to WellPoint's appointment of a replacement arbitrator.

36.    WellPoint also recognized that there had been "a reservation of rights by Hancock."    During a transcribed telephone conference call on October 4, 2005, WellPoint's counsel told the Umpire and Mr. DeCarlo that John Hancock had made clear that it was continuing to object to the resignation of Mr. Nichols and to the appointment of a replacement arbitrator.    During the conference, WellPoint gave an assurance that John Hancock would have an opportunity to attack the award on that basis at the end of the proceeding:

> Is Hancock without a remedy? No. . . .  No matter who the arbitrator is, there will be a reservation of rights by Hancock.  They will have an opportunity at the end of the case, if they don't like the award, to challenge the award on the basis the panel was improperly chosen.  They have a remedy.

Copies of relevant pages of the transcript of that telephone conference are attached as Exhibit 40.

37.    John Hancock requested that the Panel issue a ruling on its objection to WellPoint's appointment of a replacement arbitrator.  The Panel never made a ruling—formally or informally, in writing or orally—on John Hancock's objection.  The Panel never stated any position with respect to the substance of John Hancock's objection or with respect to WellPoint's right (or lack of any right) to seek and obtain Mr. Nichols' resignation or to appoint a replacement arbitrator.

38.     In the absence of any ruling, WellPoint procured Mr. Nichols' resignation and then appointed a replacement for him.  Once it became clear to John Hancock that WellPoint was going to appoint another arbitrator, John Hancock decided—subject to its continuing objection—that the remaining members of the Panel, the Umpire and Mr. DeCarlo, should be involved in the process of selecting the replacement.  John Hancock believed their participation in this process might serve to protect it against further prejudice, in that their participation might help to prevent WellPoint from appointing an arbitrator with knowledge of facts relevant to the arbitration, which he or she had acquired outside the record of the proceeding.  As described below, John Hancock's concerns were justified:  the first two replacement party-appointed arbitrators proposed by WellPoint presented serious issues of the kind John Hancock had anticipated.

39.     On September 7, 2005, WellPoint informed John Hancock, the Umpire, and Mr. DeCarlo that it had selected as a replacement party-appointed arbitrator Timothy J. McCaffrey, who had retired earlier in 2005 as general counsel of General Reinsurance Corporation ("Gen Re").  John Hancock pointed out that Gen Re had been involved in Hackett business before Mr. McCaffrey retired, and that Mr. McCaffrey had discussed the Hackett business extensively with John Hancock.  John Hancock so advised the Umpire and Mr. DeCarlo.  On September 27, 2005, WellPoint withdrew its appointment of Mr. McCaffrey.

40.     On September 30, 2005, WellPoint announced that it was appointing George C. Pratt, a former Second Circuit judge, as a replacement arbitrator.  A review of Judge Pratt's background made clear to John Hancock that he lacked the life insurance or

reinsurance background required under the Arbitration Agreement. John Hancock was also aware that Judge Pratt, while acting as a special master in another Hackett-related arbitration to which John Hancock was a party, had reviewed hundreds of privileged John Hancock documents relevant to the arbitration. John Hancock advised the Umpire and Mr. DeCarlo of these matters.

41. In an October 6, 2005 email (Exhibit 36), the Umpire, in light of what he recognized as "meaningful" concerns about Judge Pratt's suitability that John Hancock had presented, suggested that he and Mr. DeCarlo speak *ex parte* to WellPoint's lawyers "solely on the candidate they have advanced" – *i.e.*, Judge Pratt. John Hancock was concerned about the proposed *ex parte* communications between the Umpire and WellPoint's counsel, and I sought from Mr. DeCarlo clarification of the nature and purpose of the Umpire's proposed *ex parte* contact. Mr. DeCarlo told me that the Umpire had said that he wanted to discuss with WellPoint a possible procedure for selecting a replacement arbitrator other than Judge Pratt. After confirming that the proposed *ex parte* conversation with WellPoint would be limited to a discussion of concerns about Judge Pratt and a possible procedure to appoint a different replacement, John Hancock consented to the proposed *ex parte* contact.

42. Neither Mr. DeCarlo nor anyone else advised John Hancock that any specific candidates other than Judge Pratt would be discussed during the *ex parte* call with WellPoint. In agreeing to the Umpire's request for an *ex parte* contact with WellPoint, John Hancock did not anticipate, and did not consent to, the Umpire or Mr.

DeCarlo having any *ex parte* conversation with WellPoint during which specific replacement prospects would be suggested to WellPoint.

43.     WellPoint's *ex parte* discussion took place on October 11, 2005.   On October 14, John Hancock received emails, first from WellPoint and then from the Umpire (Exhibit 37), indicating that the scope of the *ex parte* conversation had gone beyond what the Umpire had proposed, and to which John Hancock had consented, and that during the *ex parte* conversation with WellPoint, the Umpire had suggested several candidates whom WellPoint might appoint.   These emails further stated that WellPoint had appointed as an arbitrator one of the candidates specifically suggested during the *ex parte* call:  Norman M. Krivosha, an Omaha lawyer who is a former Chief Justice of the Nebraska Supreme Court, with whom the Umpire had served on a panel in a prior arbitration.

44.     On or about October 15, 2005, after WellPoint announced its appointment of Judge Krivosha, Mr. DeCarlo and I discussed the October 11 *ex parte* conversation involving him, the Umpire, and WellPoint.   Mr. DeCarlo told me that he had not expected the Umpire to discuss specific replacement candidates to WellPoint during the *ex parte* call, and he made it clear that it was the Umpire who had identified Judge Krivosha to WellPoint as a potential replacement arbitrator.

### Proceedings before the Disputed Panel

45.     Over John Hancock's objection, the arbitration continued before the Umpire, Mr. DeCarlo and Judge Krivosha (the "Disputed Panel").

46.     At a hearing on discovery issues before the Disputed Panel on November 4, 2005, Judge Krivosha disclosed that he had not yet received the voluminous files reflecting the prior proceedings in the arbitration.   Nonetheless, he participated very actively in, and at times dominated, the discussions at that hearing about privilege issues, the scope of discovery, and the production of emails.  A copy of excerpts of the transcript of the November 4, 2005 hearing is attached as Exhibit 41.

### Setting of Hearing Schedule

47.     In the amended memorandum of law supporting its Second Amended Petition to Confirm Arbitral Awards ("WellPoint Mem."), WellPoint states, "the Panel bifurcated the hearing into two phases, with Phase I to address liability and Phase II to address damage amounts, if necessary."  WellPoint Mem. at 2.  The Panel did not order that the arbitration be bifurcated in that way, and the case did not proceed in that way.  As discussed below, at times during the proceedings WellPoint sought to bifurcate the arbitration so that only liability issues would be addressed in a first phase and only damages issues would be addressed in a second phase.  However, John Hancock never agreed to these suggestions, and they were never adopted by the Panel or Disputed Panel in this case.

48.     Sometime in 2004, WellPoint's then-counsel of record in the arbitration, Cyrus Benson III of White & Case LLP, approached John Hancock about the possibility of bifurcating the arbitration "to address liability first" and "to address quantum at a subsequent hearing in light of the Panel's determinations."   Mr. Benson described this suggestion to the Panel in an email dated September 23, 2004, which also addressed the

16

scheduling of the final hearing in the arbitration. I responded to that email on the same day, stating that John Hancock could not evaluate any bifurcation request without a specific proposal from WellPoint. Mr. Benson never sent a specific proposal. John Hancock never agreed to, and the Panel never ordered, a bifurcation as Mr. Benson had suggested. A copy of the email string containing the afore-referenced communications is attached as Exhibit 42. To the best of my recollection, the question of bifurcation was not raised again by WellPoint until January 2006.

49.    As shown in the email string attached as Exhibit 43, on October 8, 2004, the Panel scheduled the final hearing in the arbitration for March 2006. John Hancock, which was seeking to recover hundreds of millions of dollars from WellPoint, consistently sought to maintain that hearing date and to prevent any further delay in reaching an award.

50.    On January 18, 2006, WellPoint filed a motion to exclude the expert report submitted by Edward Buttner, John Hancock's rebuttal expert on damages issues. One of WellPoint's primary contentions was that the rebuttal report was untimely and failed to provide WellPoint with sufficient time to prepare its own damages expert for the March 2006 hearing. John Hancock disputed this contention. During a transcribed conference call on January 20, 2006, concerning WellPoint's motion to exclude, in an apparent effort to address WellPoint's stated concern about its damages expert's preparations, the Disputed Panel asked the parties whether the "hearing should start with two issues, i.e., the recoverable and the underwriting aspect and go forward to damages, if indeed there is a favorable ruling as to [John Hancock's] interest." A copy of the transcript of the

January 20, 2006 conference call is attached as Exhibit 44. (The cover page of the rough transcript erroneously identifies the date as June 20, 2006.) While counsel for both sides agreed to discuss this inquiry with their clients, on January 30, 2006, both WellPoint and John Hancock informed the Disputed Panel that they opposed bifurcation. Copies of the January 30, 2006 letters are attached as Exhibit 45.

51. On February 2, 2006, the Disputed Panel issued interim rulings in which it denied WellPoint's motion to exclude the Buttner report. The Disputed Panel also ruled that there would be no bifurcation of the proceedings. A copy of these interim rulings is attached as Exhibit 46.

52. On February 3, 2006, the day after the Disputed Panel ruled that there would be no bifurcation, WellPoint sent a letter to the Disputed Panel stating that it had re-evaluated its position regarding bifurcation in light of the February 2, 2006 interim rulings. In the letter, WellPoint asked that the arbitration be bifurcated, with a first phase to address solely liability issues, and a second phase to address damages. A copy of WellPoint's proposal is attached as Exhibit 47.

53. In response to WellPoint's bifurcation proposal, on February 20, 2006, the Umpire sent an email to the parties asking if an agreement could be reached such that the Disputed Panel would "decide all questions posed by Counsel within the [hearing] briefs, but neither proof nor decision-making would occur on fixing amounts to the specific damages." The Umpire went on to suggest that if the parties could not agree on damages "with the aid of the Panel's initial Findings" they could proceed in an agreed manner for a "second sitting of the Panel."

54.     In a letter to the Disputed Panel dated February 21, 2006, John Hancock confirmed its opposition to bifurcation, stating that the circumstances did not justify it. To allay WellPoint's stated concerns about its expert's readiness to testify in March 2006, John Hancock said that it would agree to a deferral of the testimony of both experts until the last week of the March 2006 hearing.  A copy of John Hancock's February 21, 2006 letter is attached as Exhibit 48.  On February 24, 2006, John Hancock sent another letter to the Disputed Panel stating that, as a further accommodation to WellPoint, it would accept a brief deferral of the experts' testimony beyond the end of March if the testimony could be scheduled shortly thereafter as a continuation of the hearing scheduled for March.   The letter reaffirmed John Hancock's opposition to a bifurcation of the arbitration into separate liability and damages phases.   A copy of John Hancock's February 24, 2006 letter is attached as Exhibit 49.

55.     The Umpire sent an email to the parties on February 26, 2006, seeking to clarify the phasing suggestion in his February 20, 2006 email.  The Umpire confirmed that his earlier email did not propose a bifurcation of liability and damages; rather, it proposed that not all issues in the arbitration would be determined on the basis of the March 2006 hearing.  Specifically, the Umpire suggested that the March 2006 hearing could cover liability issues and "general types of damage, if any," and that after the Disputed Panel ruled on the issues presented at the March hearing, the "specificity or certainty of specific figures" could be resolved in a second phase.  The Umpire asked the parties to "confirm or negate that there is any agreement to the potential procedure."  A

copy of the February 26, 2006 e-mail is attached as Exhibit 50. A conference call was scheduled for March 2, 2006 to address this phasing suggestion as well as other issues.

56. On the March 2, 2006 call, the Disputed Panel asked the parties' counsel to comment on its February 26, 2006 phasing proposal (which the Umpire said he would not refer to as "bifurcation"). I reiterated that John Hancock was opposed to bifurcating the case into separate liability and damages phases but would agree to a brief deferral of expert testimony beyond March. I described John Hancock's understanding of the Disputed Panel's February 26, 2006 proposal as follows: that there would be rulings on both liability and damages issues based on the factual evidence presented at the March 2006 hearing, with only expert testimony deferred to a second phase to address any disagreements as to the "accounting or integrity" of the damages figures presented at the March 2006 hearing. Based on that understanding of the proposal, I told the Disputed Panel that John Hancock was prepared to agree to it. However, WellPoint's counsel said that he disagreed with John Hancock's understanding of the proposal, indicating WellPoint's view that the proposal would defer all testimony on damages–both fact and expert–to a second phase. That arrangement would have been unacceptable to John Hancock. During the March 2, 2006 conference call, WellPoint's counsel said that WellPoint did not have access to certain damages data and would be prejudiced if it had to cross-examine John Hancock's fact witnesses on damages issues at the March 2006 hearing, and indicated that WellPoint would not agree to the phasing proposal as described by John Hancock. During the call there was no agreement or ruling on the phasing proposal. At the conclusion of the call, the Umpire said that "the panel has

enough insight to give you guys determinations for going forward." A copy of the transcript of the March 2, 2006 conference is attached as Exhibit 51.

57.     The next day, March 3, 2006, the Disputed Panel issued another set of written interim rulings, but they did not address the phasing issue. In an email transmitting these rulings, the Umpire explained that the Disputed Panel "has refrained from addressing the 'certainty of damages'" (a reference to the phasing issue) but that he believed "the transcript memorializes the respective concerns of Counsel and gives parameters, allowing Counsel to plan accordingly." A copy of the March 3, 2006 interim rulings and the accompanying email is attached as Exhibit 52.

58.     WellPoint asserts that the parties "understood that the Panel would issue its Phase I ruling to resolve all liability issues, only after which the Panel (if necessary) would hold a Phase II hearing and resolve all issues related to the amount of damages." WellPoint Mem. at 2. This is not accurate. As described above, there was no understanding or agreement between the parties or directive of the Disputed Panel, before or during the March 2006 hearing, bifurcating the arbitration into discrete liability and damages phases or providing for a final ruling after the March 2006 hearing. Accordingly, it was not John Hancock's belief (or, to my knowledge, WellPoint's) that the arbitration would be divided into damages and liability stages, with a final ruling on liability to precede expert testimony on damages.

59.     Following the March 2, 2006 conference call, the Disputed Panel did not issue any rulings on the scope of Phase I and Phase II in advance of the March 2006 hearing, and the parties continued to disagree on the demarcation between them.

## Phase I Hearing

60.     The arbitration proceeded to a Phase I hearing on liability and "general types of damage" issues (in the Disputed Panel's terms) without a clear identification of the scope of the issues.  The parties agreed to hold the Phase I hearing in Chicago.  The Phase I hearing lasted for 15 days, from March 6 through March 30, 2006.  The transcript of this hearing runs 3,801 pages.  Copies of excerpts of the hearing transcripts are attached as Exhibit 53.

61.     During the Phase I hearing, the parties called twelve live witnesses and provided the Disputed Panel with deposition testimony of 15 witnesses.  A copy of excerpts of the transcript of the deposition of Dennis M. Weinberg, the former CEO of UniCare (and a former Executive Vice President of WellPoint Health), taken on September 15, 2005, is attached as Exhibit 54.  The parties also placed 503 documents before the Disputed Panel as hearing exhibits.

62.     At the Phase I hearing, John Hancock presented evidence on both liability and damages.  With regard to damages, John Hancock presented extensive testimony and documentary evidence demonstrating that the losses and expenses it had incurred from the Hackett and FASCO businesses, on a cash basis as of December 31, 2005, totaled approximately $475 million.  John Hancock presented two witnesses who testified on these damages issues, Joseph P. Welch and Alan R. Hayes.

63.     The absence of an agreement by the parties to bifurcate the arbitration into separate liability and damages phases is further demonstrated by the parties' statements during the Phase I hearing.  When Mr. Welch testified about damages issues at the

hearing, WellPoint's counsel stated that his testimony "was not coming in as evidence of damages which is Phase II." On behalf of John Hancock, I disagreed, stating that Mr. Welch's testimony was being submitted as evidence of damages, and that only expert testimony was to be deferred to a second phase. In response to John Hancock's position, the Umpire stated "that's the general thought that we [the Disputed Panel] had," but that the Disputed Panel would reserve judgment as to whether Mr. Welch would have to testify again in a later phase.

64.     Among the issues contested at the Phase I hearing was liability for losses from the FASCO business. At the hearing, John Hancock asserted that WellPoint was responsible for $544,000 in such losses. WellPoint disputed that it was liable for the losses.

65.     Another issue that was contested extensively at the Phase I hearing was John Hancock's right to recover from WellPoint losses that stemmed from a $21.5 million award for consequential damages assessed against John Hancock in "Phase III" of its arbitration with Legion Insurance Company. At the Phase I hearing, WellPoint argued that these losses arose out of John Hancock's bad faith.

66.     Another issue that was addressed at the Phase I hearing was whether WellPoint was liable to John Hancock for shortfalls in its recoveries from two reinsurers—Reliance Insurance Company (In Liquidation) ("Reliance") and New Cap Reinsurance Corporation (Bermuda) Limited ("New Cap")—that were insolvent at the time John Hancock settled with them. During the Phase I hearing, WellPoint took the position that the shortfalls from Reliance and New Cap were due to the impaired financial

condition of those reinsurers (referred to during the arbitration as "credit risk"). John Hancock took the position that these two shortfalls in recovery were not attributable to credit risk.

67.     At the close of the Phase I hearing, both parties made submissions to the Disputed Panel. WellPoint submitted "Proposed Findings of Fact and Conclusions of Law" and a proposed "Partial Final Award." Copies of WellPoint's submissions are attached as Exhibits 56 and 57. John Hancock submitted a "Roadmap For The Panel's Interim Award," and a "Proposed Interim Award." Copies of John Hancock's submissions are attached as Exhibits 58 and 59.

68.     In its submissions after the Phase I hearing, John Hancock asked the Disputed Panel to find that WellPoint had breached its contractual obligations to John Hancock and that WellPoint was obligated to pay John Hancock damages for losses and expenses arising from the Hackett business, wherever written, and from the FASCO business, amounting to approximately $475 million, plus pre-award interest. John Hancock noted that WellPoint would have an opportunity to challenge these amounts during the Phase II hearing and that "[t]he Panel will make its final determination as to the amount of these damages after the Phase II hearing."

69.     WellPoint, in its submissions after the Phase I hearing, asked the Disputed Panel to find that: "In Phase III of the Legion arbitration, the Panel awarded $21 million of consequential damages, attorneys' fees and interest. According to Hancock's own admission, Hancock must have been found guilty of bad faith for the Legion Phase III Award to issue. WellPoint therefore has no responsibility for the Legion Phase III

Award."  John Hancock's submission asserted that "John Hancock's liability under the *Legion* award did not arise from bad faith on the part of John Hancock."

70.    In their submissions after the Phase I hearing, each party asked the Disputed Panel to rule in its favor on the issue of WellPoint's liability for the $544,000 of losses from the FASCO business.

### The Interim Rulings

71.    On May 24, 2006, the Disputed Panel issued the Interim Rulings.  A copy of the Interim Rulings is attached as Exhibit 60.

72.    WellPoint asserts that the Interim Rulings "fully disposed of all disputed liability issues."  WellPoint Mem. at 2.  *See also* Petition ¶ 17.  That is not true.  The Interim Rulings expressly left unresolved several liability issues:

(i)    The Interim Rulings did not resolve WellPoint's liability for $544,000 of losses incurred by John Hancock as a result of the FASCO business, which WellPoint claimed was resolved by an earlier settlement.  Rather, the Interim Rulings directed that the parties provide it with "further clarification and certification as to whether the $544,000 in losses alleged by John Hancock are the same losses as the $600,000 adjustment" relating to an earlier dispute between the parties that had been settled.

(ii)    The Interim Rulings did not resolve WellPoint's liability for losses arising out of the Legion award, which WellPoint claimed at the March 2006 hearing had arisen out of John Hancock's bad faith and were not WellPoint's responsibility.

(iii)    The Interim Rulings did not resolve WellPoint's liability for shortfalls in John Hancock's reinsurance recoveries from Reliance and New Cap, which WellPoint asserted were due to credit risk and not its responsibility. The Panel deferred decision on the issue until Phase II, informing the parties that it would apply a "rebuttable presumption" that shortfalls in reinsurance recoveries from financially impaired reinsures are due to credit risk.

73.    At no time did the parties agree that the Interim Rulings would constitute, or did constitute, a "final" ruling or a "final award." In addition to leaving unresolved some issues relating to WellPoint's liability, the Interim Rulings did not determine the damages to be recovered by John Hancock or resolve the issue of pre-award interest, even though John Hancock had asked the Disputed Panel to do so. These matters were left to be decided in Phase II of the arbitration.

74.    The Interim Rulings dramatically diminished the amount John Hancock could recover and required John Hancock to revise its damages assessment substantially. Over the next three and one-half months John Hancock analyzed the implications of the Interim Rulings on its damages claim, and prepared a damages presentation in accordance with the Interim Rulings, which it submitted to the Disputed Panel and to WellPoint on September 15, 2006. Following Phase II fact discovery and the analyses of the damages experts, John Hancock submitted a revised damages presentation on February 15, 2007, in which John Hancock claimed a total of approximately $47.9 million in damages on a cash basis as of June 30, 2006. In addition, in late 2006 and

early 2007, the parties had extensive disagreements about discovery, the burden of proof in Phase II, and other issues. Some of these disputes were resolved in further rulings by the Disputed Panel, which it styled as "Interim Rulings on Phase II." A copy of the Disputed Panel's Interim Rulings on Phase II is attached as Exhibit 61.

**WellPoint's Petition to Confirm the Interim Rulings**

75. On February 20, 2007—six days before the Phase II hearing began—WellPoint filed its original petition to confirm the Interim Rulings under section 9 of the FAA, 9 U.S.C. § 9, in the U.S. District Court for the Northern District of Illinois.

**The Phase II Hearing**

76. The hearing on the issues to be resolved in Phase II of the arbitration was convened in New York City in late February 2007. During four hearing days from February 26 through March 1, 2007, the parties presented evidence and arguments on the issues left open by the Interim Rulings. These issues principally involved damages, including John Hancock's revised damages presentation, but also included the liability issues that were raised in Phase I but not resolved in the Interim Rulings. John Hancock called two fact witnesses (Messrs. Welch and Hayes, each of whom had testified at the Phase I hearing), and each side had a damages expert testify at the Phase II hearing. Copies of relevant pages of the transcript are attached as Exhibit 62.

77. At the Phase II hearing, John Hancock presented evidence of its recoverable costs and expenses arising from the Hackett and FASCO businesses, in accordance with the limitations imposed by the Interim Rulings, on a cash basis as of

June 30, 2006. WellPoint accepted some components of John Hancock's damages case and challenged others.

78. Both sides' presentations at the Phase II hearing referred back to, and argued from, evidence that had been presented at the Phase I hearing. The direct examination of both Mr. Welch and Mr. Hayes referred back to the testimony the witnesses gave during the March 2006 hearing relating to the accounting systems used by John Hancock to determine its damages. The cross-examination of these witnesses by WellPoint's counsel also referred back to testimony given by them in March 2006. During the cross-examination of Mr. Hayes, for example, WellPoint's counsel referred Mr. Hayes back to his Phase I damages testimony regarding the reliability of the database that John Hancock used to calculate its damages, and continued questioning Mr. Hayes on that subject.

79. With regard to losses from the FASCO business, John Hancock responded to the Disputed Panel's direction in the Interim Rulings that the parties provide "further clarification" as to whether John Hancock was claiming the same losses that had been at issue in an earlier dispute between the parties, which had led to an arbitration that was settled in 1999. John Hancock presented in its Phase II hearing brief a discussion of the relevant facts and documents, which showed that the two amounts were unrelated. A copy of the relevant excerpt from that brief is attached as Exhibit 63.

80. At the Phase II hearing, John Hancock described to the Disputed Panel its understanding of the issues that had been decided in Phase I and those that remained for decision in Phase II. The Phase II issues, in John Hancock's view, included the issues

pertaining to John Hancock's claims for breach of contract that had been left open by the Interim Rulings and the amount of damages that John Hancock would recover for the breaches of contract determined by the Disputed Panel in the Interim Rulings and after Phase II. WellPoint presented to the Disputed Panel an entirely different view of Phase I and Phase II. WellPoint asserted that there had been no finding of WellPoint's liability in Phase I, and that there would be no determination of damages in Phase II. Rather, WellPoint asserted, the objective in both Phase I and Phase II was to reach a determination of the amount of a "proper bill" that would establish the amount owed to John Hancock by WellPoint.

81. With regard to the alleged bad faith of John Hancock, WellPoint submitted a Statement of Issues to be decided in Phase II that included whether "Hancock's damages presentation improperly includes amounts relating to the Legion Phase III Award." John Hancock's Statement of Issues to be decided in Phase II also included whether "the arbitrators in any other arbitrations between John Hancock and any cedents of Hackett business written in the United States made a finding of fraud or bad faith on the part of John Hancock with respect to such business." Copies of the statements of issues submitted by WellPoint and John Hancock are attached as Exhibits 64 and 65, respectively. The Legion bad faith issue was again addressed extensively during the direct examination and cross examination of Mr. Welch and in opening and closing arguments at the February 2007 hearing.

82.     With regard to credit risk, at the Phase II hearing John Hancock presented evidence that the shortfalls in recoveries from Reliance and New Cap were due, at least in part, to factors other than credit risk.

83.     On March 1, 2007, near the close of the Phase II hearing, the Umpire discussed with the parties practical aspects of entering a final award and of the Disputed Panel becoming *functus officio*, and he explained his practice of not issuing a final award without giving the parties a brief period afterward to seek clarification.  There was no discussion of any of these subjects in connection with the Interim Rulings.

84.     On March 1, 2007, WellPoint presented to the Panel a proposed "Phase II Award," in which it suggested that the Disputed Panel refer to the Phase I Interim Rulings as an "Award[]."  The Disputed Panel declined to do so.  A copy of WellPoint's proposed Phase II Award is attached as Exhibit 66.  Consistent with its position after the Phase I hearing, John Hancock in a March 8, 2007 letter asked the Disputed Panel to enter its final award after Phase II.  A copy of John Hancock's March 8, 2007 letter, along with John Hancock's proposed Final Award, is attached as Exhibit 67.

## The Award

85.     On April 23, 2007, the Disputed Panel rendered the Award.  In the Award, the Disputed Panel ruled on all of the liability and damages issues that remained open.  The three liability issues that were expressly left open by the Interim Rulings, as noted in paragraph 72 above, were resolved in paragraphs 2, 5, and 10 of the Award.  In paragraph 1, the Disputed Panel resolved another liability issue that emerged during Phase II by ruling that WellPoint was liable for a portion of losses and expenses arising

from a group of Hackett contracts that WellPoint had contended were written in Bermuda.  In the Award, the Disputed Panel determined that John Hancock was entitled to damages in the amount of $26,093,162.45 and pre-award interest (net of offsets) in the amount of $2,950,000.  The Disputed Panel stated in the Award that "[a]ll other claims and counterclaims are denied."  A copy of the Award is attached as Exhibit 68.

86.    In the Award, the Disputed Panel directed the parties to meet and confer within 20 days of receiving the Award, while the Disputed Panel remained seated to resolve any questions or concerns that might arise.  The parties conferred during the weeks following April 23.  The parties sent a joint letter to the Disputed Panel dated May 14, 2007, requesting a correction to one of the components of the damages referred to in the Award, that would increase the total damages awarded to John Hancock by $389,754.75 and make the total damages $26,482,917.20 under the Award.  A copy of that letter is attached as Exhibit 69.

87.    On May 21, 2007, the Disputed Panel issued a "Revision of Award," which made the correction to the amount of damages requested in the parties' joint letter dated May 14, 2007.  A copy of the Revision of Award, with the Umpire's transmittal letter, is attached as Exhibit 70.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Washington, D.C., on May 24, 2007.

_____

Mark J. Leimkuhler

## <u>CERTIFICATE OF SERVICE</u>

Jonathan C. Bunge, one of the Attorneys for Respondent John Hancock Life Insurance Company, hereby certifies that on May 24, 2007, he did cause a true and correct copy of the foregoing **Declaration of Mark J. Leimkuhler in Support of John Hancock Life Insurance Company's Application to Vacate Arbitration Award and in Opposition to Petition to Confirm Award and Interim Rulings** to be filed pursuant to the Court's CM/ECF System, which will send notice to the following:

> Keith P. Schoeneberger
> Elizabeth M. Bradshaw
> David A. Campbell
> LeBoeuf, Lamb, Greene & MacRae, LLP
> Two Prudential Plaza
> 180 N. Stetson Avenue, Suite 3700
> Chicago, Illinois 60601
>
> John M. Nonna
> Michael A. Knoerzer
> LeBoeuf, Lamb, Greene & MacRae, LLP
> 125 W. 55th Street
> New York, New York 10019
>
> Sheila M. Finnegan
> Jeffrey W. Sarles
> Gina M. Diomedi
> Mayer, Brown, Rowe & Maw LLP
> 71 S. Wacker Drive
> Chicago, Illinois 60606
>
> *Attorneys for Petitioners, WellPoint Health*
> *Networks Inc. and Unicare Life & Health*
> *Insurance Company*

**s/ Jonathan C. Bunge**