

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WELLPOINT HEALTH NETWORKS,   )
INC. and UNICARE LIFE & HEALTH   )
COMPANY,   )
              Petitioners,   )
  )
v.   )    No. 07 C 943
  )
JOHN HANCOCK LIFE INSURANCE   )    Judge Ruben Castillo
COMPANY,   )
  )
              Respondent.   )

## MEMORANDUM OPINION AND ORDER

Petitioners WellPoint Health Networks Inc. and its wholly owned subsidiary UniCare Life & Health Insurance Company (collectively "Wellpoint") petition pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, for the confirmation of two arbitral awards arising from an arbitration captioned, *WellPoint Health Networks, Inc. and Unicare Life & Health Insurance Company v. John Hancock Life Insurance Company.* (R. 35, WellPoint's Second Amended Petition to Confirm Arbitral Wards ("Sec. Am. Pet.").) Respondent John Hancock Life Insurance Company ("John Hancock") petitions pursuant to 9 U.S.C. § 10(a)(4) to vacate the panel's final arbitral award on the ground that the appointment of one of the arbitrators did not comply with the selection method set forth in the parties' agreement to arbitrate. (R. 37, John Hancock's Cross-Petition to Vacate Arb. Award.) For the reasons stated below, WellPoint's petition to confirm the arbitration award is granted, and John Hancock's petition to vacate the arbitration award is denied.

1

## BACKGROUND[1]

WellPoint is a California company with its principal place of business in Thousand Oaks, California. (R. 35, WellPoint's Sec. Amend. Pet. ¶ 2.) WellPoint's subsidiary, UniCare, is an Indiana company with its principal place of business in Chicago, Illinois. (*Id.* ¶ 3.) John Hancock is a Massachusetts company with its principal place of business in Boston, Massachusetts. (*Id.* ¶ 4.)

In October 1996, WellPoint agreed to purchase various Group Business Operations of John Hancock, referred to herein as the "GBO Transaction." (*Id.* ¶ 7.) The GBO Transaction was accomplished through a series of interrelated contracts consisting principally of a Purchase and Sale Agreement ("PSA"), a Coinsurance Agreement, and an Administration Agreement (collectively "the GBO Transaction Agreements"), each of which contains an express provision mandating that disputes be resolved through binding arbitration. (*Id.* ¶ 8-11; *id.*, Exhibits C-E.)

A dispute subsequently arose between the parties regarding whether WellPoint was obligated, as part of the GBO Transaction, to make certain payments to John Hancock. (R. 37, John Hancock's Cross-Pet. ¶ 12.) The dispute involved WellPoint's obligations with respect to three loss-producing books of insurance business: (1) Fiduciary Administration Services Company (the "FASCO Business"); (2) James E. Hackett Reinsurance Corporation (the "Hackett Business"); and (3) JEH Re Underwriting Management Bermuda Ltd. (the "Bermuda Business").

---

[1] The FAA provides that a petition to confirm or vacate an arbitral award "shall be made and heard in the manner provided by law for the making and hearing of motions. . . . " 9 U.S.C. § 6. A court deciding such a motion must adequately consider the record, which includes any relevant portions of the transcript "and any written submissions in the form of objections, affidavits, etc. by the parties." *Health Serv. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1259 (7th Cir. 1992).

(*Id.*) On October 16, 2002, WellPoint filed a demand for arbitration against John Hancock to require John Hancock to disclose requested information about these books of business and declaring WellPoint's rights and obligations under the GBO Transaction Agreements. (R. 35, WellPoint's Sec. Am. Pet. ¶ 12; R. 46, WellPoint's Reply, Appendix, Exhibit 3.) John Hancock filed a counter-demand for arbitration against WellPoint on November 27, 2002, seeking $42.4 million allegedly due from WellPoint. (R. 35, WellPoint's Sec. Amend. Pet. ¶ 13; R. 46, WellPoint's Reply, Appendix, Exhibit 4.)

Section 15 of the PSA addresses the qualifications of the arbitrators as well as the process by which they are to be selected. (R. 35, WellPoint's Reply, Appendix, Exhibit C.) Specifically, the PSA provides:

> Section 15.3 <u>Appointment of Arbitrators.</u> A panel of three (3) arbitrators will decide any dispute or difference between the parties. All arbitrators must be (a) disinterested officers or retired officers of life insurance or life reinsurance companies other than the parties to this Agreement of their Affiliates, or (b) disinterested persons of comparable experience. Each of the parties agrees to appoint one of the arbitrators. In the event that either party shall fail to appoint an arbitrator within twenty (20) Business Days following receipt of the notice demanding arbitration set forth in Section 15.2 hereof, the party demanding such arbitration may appoint the second arbitrator before entering upon arbitration. The two party-appointed arbitrators shall select a third arbitrator. In the event that the two party-appointed arbitrators shall not be able to agree on the choice of the third arbitrator within twenty (2) Business Days following their appointment, the parties may agree on a third arbitrator within the next twenty (20) Business Days, and if they have not so agreed, the Denver, Colorado office of the American Arbitration Association shall, at the request of either party, appoint as such third arbitrator a person who meets the qualifications specified in the second sentence of this section 15.3.

(*Id.* § 15.3.) Section 15 further provides that "[t]he decision in writing by any two arbitrators

3

shall be final and binding on both of the parties." (*Id.* § 15.4.)

Pursuant to Section 15.3, WellPoint appointed David J. Nichols ("Nichols") as its arbitrator, and John Hancock appointed Donald DeCarlo ("DeCarlo"). (R. 38, John Hancock's Cross-Pet. ¶ 16.) Both appointments were made within 20 business days after service of the arbitration demand, as required by Article 15. (*Id.*) The two party-appointed arbitrators could not agree on a third arbitrator, however, so in accordance with Article 15, the Denver office of the American Arbitration Association ("AAA") appointed the third arbitrator, Richard S. Bakka, who was referred to during the arbitration as the "Umpire." (*Id.* ¶ 17.) As of August 5, 2003, with the appointment of Bakka as Umpire, the three-arbitrator panel was duly constituted. (*Id.* ¶ 17.)

The parties conducted extensive discovery over the course of the next two years, which included the exchange of thousands of documents and the deposition of 29 witnesses. (R. 35, WellPoint's Sec. Amend. Pet. ¶ 14.) During this period, the panel resolved various discovery disputes and other procedural issues pertaining to the arbitration, which was scheduled to take place in March 2006. (R. 38, John Hancock's Cross-Pet. ¶¶ 18-19; R. 39, Leimkuhler Decl., Appendix, Exhibit 15.)

## The Substitution of Nichols

In July 2005, John Hancock sent WellPoint a letter increasing its damages demand from $42.4 million to $464.6 million. (R. 46, WellPoint's Reply, Appendix, Exhibit 5.) Three weeks later, WellPoint obtained new co-counsel from the law firm of LeBoeuf, Lamb, Greene & MacRae ("LeBoeuf"). (*Id.*, Exhibit 6.) Shortly thereafter, Nichols communicated to the Umpire that WellPoint had requested that he "stand down" as its appointed arbitrator. (*Id.*) The Umpire

4

raised the issue of WellPoint's request in an email to both parties, stating:

> The Panel had a conference call yesterday in which David [Nichols]
> advised of a probable scenario. It appears that rather than LeBoeuf
> appearing as Co Counsel, there may be a substitution negating White
> and Case participation. Further, a request has been made for David
> to 'stand down,' with a yet to be named arbiter substitution.
>
> Within the call, concern was evidenced that with the absence of
> White and Case, can LeBoeuf aver that the Hearing dates continue to
> be 'etched in stone?' Absent that affirmation, Hancock will have a
> voice as to the substitution.
>
> The change in arbiters, absent health, disability or death problems,
> may not be a unilateral decision by Wellpoint and/or Counsel. The
> arbitration has a lengthy history with numerous exchanges, motions
> and rulings by this duly constituted Panel. It is recognized that most
> of those decisions dealt with hard fought discovery questions (neither
> side being happy with the resultants). While the main Case has yet
> to be formally addressed, certainly the exchange between the Panel
> members have identified the issues and tried to assure that the
> evidentiary materials will ultimately allow comprehensive and
> informed decision-making.

(*Id.*) WellPoint's counsel responded by letter the following day, confirming that LeBoeuf would

be taking over as lead counsel, and stating in part:

> We further confirm that, at the direction of WellPoint, we have asked
> Mr. Nichols to voluntarily withdraw as WellPoint's party-appointed
> arbitrator. We have explained to Mr. Nichols WellPoint's reasons for
> making this request. It has been stressed to Mr. Nichols that
> WellPoint acknowledges it cannot at this time unilaterally terminate
> Mr. Nichol's appointment.
>
> We understand Mr. Nichols' chief concern arising from WellPoint's
> request relates to the impact of his withdrawal upon the arbitration
> schedule. This also appears to be the chief concern expressed in the
> Umpire's August 17, 2005, e-mail.
>
> We understand that the Hearing is scheduled for March 2006.
> WellPoint avers that it will abide by the Hearing schedule and that the
> substitution of its party-appointed arbitrator will not require a change

5

in that schedule.

(*Id.*, Exhibit 7.)

A few days thereafter, John Hancock sent the panel a letter voicing its objection to

WellPoint's attempt to remove Nichols from the panel. (*Id.*, Exhibit 9.) In short, John Hancock

objected that there was no basis for Nichols to be removed, and that he should remain on the

panel:

> WellPoint's request is wholly improper. It is contrary to the
> controlling arbitration provisions, arbitration custom and practice, the
> ethical principles governing the conduct of arbitrators, and sound
> considerations of arbitration public policy. Moreover, it would
> unfairly prejudice John Hancock and inject serious legal error into
> this proceeding if permitted.

(*Id.* at 1.) WellPoint's counsel responded by letter the following day, and while not revealing the

reason WellPoint had asked Nichols to withdraw, he denied that WellPoint was seeking some

tactical advantage:

> WellPoint believes that it is sufficient that it has expressed its reasons
> to Mr. Nichols and that he has responded to us that he does not
> disagree with them. WellPoint will disclose that it has made plain to
> Mr. Nichols that it is seeking no tactical or strategic advantage by the
> request that he withdraw. Beyond this, WellPoint considers the issue
> to be a confidential communication which should be revealed only at
> Mr. Nichols' discretion.

(R. 39, Leimkuhler Decl., Appendix, Ex. 21.)

In subsequent communications occurring over the next few weeks, the parties and panel

members grappled with how to resolve the issue of Nichols' possible removal from the panel.

(R. 46, WellPoint's Reply, Appendix, Exhibits 10-12.) No agreement could be reached between

the parties as to the proper way to proceed. (*Id.*, Exhibit 1.) John Hancock's counsel asserts that

6

during this period, DeCarlo advised him that WellPoint was pressuring Nichols to withdraw, and that Nichols ultimately determined he could not continue to serve on the panel in the face of WellPoint's demands that he step down.[2] (R. 39, Leimkuhler Decl. ¶ 32.) After discussions in which it was determined that Nichols' withdrawal would not impact the arbitration schedule, on September 3, 2005, the Umpire issued an email to the parties on behalf of the panel stating: "David Nichols has requested to withdraw as arbiter and the Panel accepts his withdrawal. The remanents [sic] of the Panel will await WellPoint's advancing of a candidate for disclosure in accord with the affirmed 'vetting.'" (R. 46, WellPoint's Reply, Appendix, Exhibit 1.)

WellPoint thereafter appointed a replacement arbitrator, to whom John Hancock objected. (*Id.*, Exhibits 2, 15-18.) John Hancock also continued to voice its objection "to the Panel's determination, and Nichols' decision individually, to accede to WellPoint's improper demand that Mr. Nichols no longer participate on the Panel." (*Id.*, Exhibit 2.) John Hancock contended that it should be permitted to select Nichols' replacement, asserting that Nichols' withdrawal should be construed as a default by WellPoint in failing to timely appoint an arbitrator under Article 15 of the PSA. (*Id.*) Alternatively, John Hancock argued that the remaining panel members should select a replacement or, absent their agreement, the matter be submitted to the AAA. *Id.*

---

[2] John Hancock acknowledges that there was nothing inherently improper about WellPoint's *ex parte* communications with its own arbitrator: "There was no agreement between the parties requiring the party-appointed arbitrators to be strictly neutral. As is customary in reinsurance arbitrations, each of the party-appointed arbitrators had a dual role: in addition to being a member of the Panel that was expected to fairly resolve the dispute, he was permitted to put forward the positions being advocated by the party that had appointed him. As part of the latter function . . . each side was permitted to have *ex parte* communications with the arbitrator it had appointed, throughout the pre-hearing period up until the submission of the parties' hearing memoranda in February 2006." (R. 39, Leimkuhler Decl. ¶ 21.)

The remaining panel members subsequently conducted a teleconference with the parties and WellPoint's proposed replacement arbitrator to discuss his qualifications; ultimately, the replacement arbitrator was rejected by the remaining panel members. (*Id.*, Exhibit 18-19.) WellPoint then proposed a second replacement arbitrator, to which John Hancock also raised objections. (*Id.*, Exhibits 20-23.) During a telephone conference with the parties on October 4, 2005, DeCarlo suggested that he and the Umpire propose three substitute arbitrators and let WellPoint choose one of the three. (*Id.*, Exhibit 24.) In response to WellPoint's initial rejection of this idea, John Hancock's counsel stated, "I believe there is case law that will support this. . . ." (*Id.*, Exhibit 25.) Over the next few weeks, numerous discussions occurred regarding this and other suggestions for filling the vacancy; some of the discussions occurred *ex parte* between the remaining panel members and each party. Although at the time each side agreed to the *ex parte* communications, John Hancock now asserts that the *ex parte* discussions that occurred between WellPoint and the panel members went beyond the scope of what it had agreed to. (R. 39, Leimkuhler Decl. ¶¶ 41-43.)

During an *ex parte* discussion with WellPoint, the panel members suggested potential replacement arbitrators, including Norman M. Krishova ("Krishova"), a retired Chief Justice of the Nebraska Supreme Court and former general counsel of a life insurance company. (R. 46, WellPoint's Reply, Appendix, Exhibit 29.) Although WellPoint continued to view its proposed replacement arbitrator as qualified, after the meeting WellPoint agreed to withdraw its appointment and appoint Krishova instead. (*Id.*) On October 20, 2005, the panel members, the parties, and Krishova engaged in a teleconference to discuss Krishova's qualifications. (*Id.*, Exhibit 30.) The following day, John Hancock renewed its objection to Nichols' resignation, but

8

agreed that Krishova met the prerequisites for service as WellPoint's party-appointed arbitrator. (*Id.*, Exhibit 31.) Shortly thereafter, the Umpire sent an email to the parties confirming that Krishova had been instated as a panel member, and that the panel was now duly constituted. (*Id.*, Exhibit 32.)

## The Arbitration Hearings

In December 2005, the parties submitted their expert reports on damages in preparation for the March 2006 arbitration. WellPoint moved to strike John Hancock's expert report as untimely and improperly resting on previously undisclosed opinions of other experts. (*Id.*, Exhibit 33.) WellPoint's motion generated discussions between the parties and panel members as to whether the arbitration hearing should proceed in two phases in terms of liability and damages. (*Id.*, Exhibit 34-36.) Numerous suggestions were made, and at various times rejected, as to how the issues might be bifurcated into two hearings. (*Id.*, Exhibit 35-36; R. 39, Leimkuhler Decl. ¶¶ 51-59.) Ultimately, it was agreed that the hearing would not be "bifurcated into undefined liability and damages phases," but rather: "[T]hat the panel would deliberate and render an award on the issues that are presented in the first phase, which would include liability issues and damages issues, but subject to any disagreements that the experts might have on the accounting of those damages, and the integrity of the numbers that have been presented in the first phase, that those things would be addressed in a separate phase . . . ." (R. 46, WellPoint's Reply, Appendix, Exhibit 36.) In other words, Phase I would address liability issues and certain categories of damages, but an exact accounting of damages would be addressed in Phase II. (*See id.*, Exhibit 37.) The panel thereafter proceeded to conduct the arbitration hearing in two phases.

Phase I of the arbitration occurred in March 2006 over the course of 15 days, during which time the parties presented extensive witness testimony, documentary evidence, and argument. (R. 39, Leimkuhler Decl. ¶ 60.) Following the Phase I hearing, the panel issued an order styled, "Interim Rulings on Phase I," referred to herein as the "Phase I ruling." (R. 35, WellPoint's Sec. Amend. Pet., Exhibit A.) The panel concluded that WellPoint had not purchased the Bermuda Business as part of the GBO Transaction and therefore had no liability arising out of that business. (*Id.* at 1.) The panel further concluded that WellPoint had assumed 100 percent of the Hackett Business and 100 percent of the FASCO business, subject to certain limitations. (*Id.* at 1-2.) John Hancock's appointed arbitrator, DeCarlo, dissented from that part of the ruling concluding that WellPoint was not liable for the Bermuda Business. (*Id.* at 2-3.)

Phase II of the arbitration occurred in February 2007 over the course of four days, and was limited to issues concerning the proper measure of damages. (R. 39, Leimkuhler Decl. ¶ 76.) Following the Phase II hearing, the panel on April 23, 2007, issued its "Award," which directed WellPoint to pay John Hancock approximately $26 million in damages plus $2.9 million in "offsetting balances and interest assessments." (R. 35, WellPoint's Sec. Amend. Pet. ¶ 20, Exhibit B.) On May 21, 2007, at the request of the parties, the panel revised its calculation of damages to $26.4 million. (*Id.*, Exhibit B-1.) This amount represented a fraction of the roughly $464 million John Hancock had sought to recover. (R. 39, Leimkuhler Decl. ¶ 11.)

## PROCEDURAL HISTORY

On February 20, 2007, just prior to the beginning of the Phase II hearing, WellPoint filed a petition in federal court to confirm the panel's Phase I ruling, which WellPoint referred to as the "Phase I Final Award." (R. 1, WellPoint's Pet. to Confirm Arbitral Award at 1.) On April

23, 2007, WellPoint filed an amended petition seeking confirmation of the Phase I and Phase II rulings. (R. 32, WellPoint's Am. Pet.) On May 21, 2007, WellPoint filed a Second Amended Petition after the panel issued its revised Award with the new calculation of damages. (R. 35, WellPoint's Sec. Am. Pet.) On May 24, 2007, John Hancock filed a Cross-Petition seeking to vacate the panel's award. (R. 37, John Hancock's Cross-Pet.)

The petitions are now fully briefed.[3] John Hancock argues that the panel's award must be vacated because one of the panel members, Krishova, was not selected in accordance with the parties' agreement to arbitrate. (R. 38, John Hancock's Mem. of Law at 1-2.) WellPoint argues that John Hancock's petition to vacate is untimely, and thus cannot be considered, because it should have been filed within three months of the panel's Phase I ruling. (R. 46, WellPoint's Reply at 3.) WellPoint additionally argues that, assuming John Hancock's petition is timely, the panel's award should nevertheless be confirmed because the parties' arbitration agreement does not expressly address the issue of withdrawal of an arbitrator, and the replacement arbitrator, Krishova, was selected "only after a comprehensive and fair deliberative process . . . in which Hancock fully participated." (*Id.* at 3-4.)

## ANALYSIS

The FAA embodies a federal policy favoring enforcement of arbitration agreements. *Hall Street Assoc., LLC v. Mattel, Inc.*, 128 S. Ct. 1396, 1402 (2008); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The FAA does not provide a basis for federal jurisdiction over arbitration disputes, but instead requires an independent jurisdictional basis.

---

[3] This case was originally assigned to District Judge Filip, and was reassigned to this Court on March 6, 2008, upon Judge Filip's departure from the bench. (R. 52, Executive Committee Order.)

*Mattel*, 128 S. Ct. at 1402. Here, the parties assert that the Court has diversity jurisdiction; upon review, the Court is satisfied that the requirements of diversity jurisdiction are met. 28 U.S.C. § 1332.

In cases falling within the federal court's jurisdiction, the FAA provides that an arbitration clause in a contract involving a commercial transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA also provides a mechanism for enforcing arbitration awards, which are not self-executing. 9 U.S.C. § 9-11; *Mattel*, 128 S. Ct. at 1402. Any time within one year after an arbitration award is made, any party to the arbitration may apply to the Court for an order confirming the award. 9 U.S.C. § 9. "A court's role in reviewing an arbitral award is quite limited." *Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO*, 336 F.3d 629, 632 (7th Cir. 2003). With few exceptions, as long as the arbitrator has not exceeded his authority, the award will be enforced, even if the arbitrator committed a "serious error" of law or fact. *Butler*, 336 F.3d at 632. Were it otherwise, "arbitration would be just the first of a series of steps that always culminated in court litigation, and it would lose its *raison d'etre*." *Id.*

A court must confirm an arbitration award unless the award is vacated in accordance with Section 10 of the FAA, or modified or corrected in accordance with Section 11 of the FAA. 9 U.S.C. § 9; *Mattel*, 128 S. Ct. at 1402; *IDS Life Ins. Co. v. Royal Alliance Assoc., Inc.*, 266 F.3d 645, 650 (7th Cir. 2001). Section 10, the applicable provision here, provides for vacatur of an arbitration award in four situations, all of which address "egregious departures from the parties' agreed-upon arbitration." *Mattel*, 128 S. Ct. at 1404. Specifically, vacatur is permitted where the award was procured by corruption or fraud; where the arbitrators were partial; where the

arbitrators were guilty of misconduct that prejudiced the rights of a party; or, the provision invoked by John Hancock, "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(1)-(4).

## I.    Timeliness of John Hancock's Cross-Petition to Vacate

The first issue that must be addressed is whether John Hancock's Cross-Petition to Vacate was timely filed. Under the FAA, a motion to vacate, modify, or correct an arbitration award "must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Here, the Cross-Petition was filed on May 24, 2007, well within three months of the panel's Phase II award. (R. 37, John Hancock's Cross-Petition to Vacate.) However, WellPoint argues that the time for filing actually began to run when the panel made its Phase I ruling, and that John Hancock's Cross-Petition, filed approximately one year later, is therefore untimely. (R. 46, WellPoint's Reply at 34-40.) John Hancock disagrees that the Phase I ruling triggered the time for filing a petition to vacate under Section 10. (R. 38, John Hancock's Mem. of Law at 29-40.) In essence, the parties dispute whether the panel's Phase I ruling was a final award subject to judicial review.

As the Seventh Circuit has recognized, there is "no statute corresponding to section 1291 [that] tells the courts when an arbitration award is ripe for judicial enforcement or review." *Smart v. IBEW*, 315 F.3d 721, 725 (7th Cir. 2003). Instead, courts must consider as a practical matter whether the arbitrator has completed his assignment. *McKinney Restoration Co., Inc. v. Ill. Dist. Council*, 392 F.3d 867, 869 (7th Cir. 2004). "[W]here an arbitrator believes the assignment is completed, the award is final and appealable." *Id.* at 872. Conversely, "[w]here

13

the evidence establishes that the arbitrator does not believe the assignment is completed, the award is not final and appealable." *Id.*

The finality of an arbitration award "should be judged by substance and effect, not by superficial technicalities." *Olson v. Wexford Clearing Servs. Corp.*, 397 F.3d 488, 492 (7th Cir. 2005). Thus, an arbitration award that is final in every sense but does not use the magic word "award" is nevertheless final and appealable. *Publicis Commc'n v. True North Commc'n, Inc.*, 206 F.3d 725, 728 (7th Cir. 2000). To hold otherwise would be "extreme and untenable formalism." *Id.* Essentially, the Court must decide whether "the award itself, in the sense of judgment, order, bottom line, is incomplete in the sense of having left unresolved a portion of the parties' dispute." *Olson*, 397 F.3d at 491.

Here, the substance and effect of the panel's Phase I Ruling indicates that it is not a final award subject to judicial review. Indeed, the fact that the panel specified the ruling as pertaining solely to "Phase I" suggests that the arbitrators necessarily envisioned a "Phase II." Further, the arbitrators chose to style their order, "Interim Rulings on Phase I," despite a proposal by WellPoint that the panel style their ruling a "Partial Final Award." (R. 39, Leimkuhler's Decl. ¶¶ 67, 84; *id.*, Exhibits 56-57, 66.) Although nomenclature is not conclusive, the language used by the panel in drafting the ruling signals that it did not view its work as completed with the Phase I Ruling. Moreover, the procedural history of the arbitration indicates that the parties and the panel members predetermined that the arbitration hearing would proceed in two phases, but would result in one complete ruling. (R. 46, WellPoint's Reply, Appendix, Exhibits 36-37.) In summary, based on the record, it is evident that the arbitrators did not consider their work completed with the entry of the Phase I Ruling and thus, this ruling is not a final award subject to

14

judicial review.

WellPoint is correct that in certain limited circumstances the Seventh Circuit has allowed judicial review of discrete issues decided by an arbitration panel even where the arbitration has not been completed. For instance, in *Publicis*, the Seventh Circuit permitted an immediate appeal of an arbitration panel's ruling requiring one of the parties to turn over certain tax records, a matter the panel deemed sufficiently time-sensitive to be carved out from the other issues left to be decided. *Publicis*, 206 F.3d at 728. The *Publicis* court concluded that "a ruling on a discrete, time-sensitive issue may be final and ripe for confirmation even though other claims remain to be addressed by arbitrators." *Id.* at 729. The Court relied on the panel's determination that turnover of the tax records "should not await final confirmation in the Final Award," and observed that "[r]equiring the unrelated issues to be arbitrated to finality before allowing True North to enforce a decision the tribunal called urgent would defeat the purpose of the tribunal's order." *Id.* Thus, under the unique circumstances present in *Publicis*, the Court permitted immediate appeal of the arbitration panel's ruling regarding turnover of the tax records. *Id.*

Similarly, in *Yasuda Fire & Marine Ins. Co. v. Continental Cas. Co.*, 37 F.3d 345 (7th Cir. 1994), the Seventh Circuit allowed an immediate appeal of an arbitration panel's order requiring one of the parties, Yasuda, to post an interim letter of credit in order to protect a possible final award in favor of the other party, CNA. The Court pointed out that the panel had concluded "that if it did not order interim relief CNA would have to bear the risk that any final award it might win would be meaningless." *Id.* at 348. The Court reasoned that CNA had a right to seek immediate confirmation of the panel's interim order, and by the same token, Yasuda had a right to seek to have the panel's order immediately vacated if the panel had exceeded its

15

authority in entering the order. *Id.* The Court thus permitted immediate judicial review of this "temporary equitable order calculated to preserve assets" which was "needed to make a potential final award more meaningful." *Id.*

Notably, following *Publicis* and *Yasuda,* another panel of the Seventh Circuit expressed criticism of an approach that would permit immediate appeal of certain issues decided by the arbitration panel before the arbitration was completed, which would appear to engraft Federal Rule of Civil Procedure 54(b) onto the FAA.[4] *See IDS Life Ins. Co.*, 266 F.3d at 650 ("These cases create a regime that is similar to the one that Fed. R. Civ. P. 54(b) creates for federal litigation, yet is in tension with the absence from the Federal Arbitration Act of any counterpart to that rule. But it is not a tension that need be resolved in this case."). Notwithstanding this possible tension in the case law, the unique circumstances present in *Publicis* and *Yasuda* which led the Seventh Circuit to permit an immediate appeal are not present here. This Court views the decisions in *Publicis* and *Yasuda* as limited exceptions to the general rule that judicial review of an arbitration award is not appropriate until it is clear that the arbitrators have completed their assignment. In this case, there is nothing in the record to suggest that the matters addressed in the Phase I ruling were so time-sensitive that they could not await final adjudication of the remaining issues, nor did the Phase I ruling constitute a "temporary equitable order" needed to prevent a final award from becoming meaningless. For these reasons, the Court finds *Publicis* and *Yasuda* distinguishable.

---

[4] The Seventh Circuit has expressed particular doubt over the propriety of the First Circuit's approach, which it characterized as "even more hospitable" to what amount to interlocutory appeals of arbitral awards. *Smart*, 315 F.3d at 725. Because of this criticism, and because there is ample Seventh Circuit case law on point, this Court is not persuaded by the First Circuit cases cited in WellPoint's reply brief. (*See* R. 46, WellPoint's Reply at 36-37.)

The Court is also not persuaded by WellPoint's citation to *Smart* for the proposition that "an arbitral ruling may be subject to judicial review 'even if all it did was determine liability, leaving thorny remedial issues for future determination.'" (R. 46, WellPoint's Reply at 34 (quoting *Smart*, 315 F.3d at 726).) When placed in context, the language cited by WellPoint does not support a determination that the panel's Phase I ruling was a final award. In the passage WellPoint references, the Seventh Circuit observed that the final-judgment rule contained in 28 U.S.C. § 1291 does not apply to arbitration awards, and explained that application of the rule does not make sense in the arbitration setting: Because the parties bear the full expense for arbitration, they may wish to economize by confining the arbitrator to deciding only certain issues. *Smart*, 315 F.3d at 725-26. The Court then observed:

> Indeed, if the final-judgment rule applied to arbitrators' awards, the award in this case might pass muster anyway, because the computation of the [damages] owed by Smart may be mechanical. But even if it would not be, if it were clear that the arbitrators had finished their assignment and clear as well what their award required the award would be enforceable even if all it did was determine liability, leaving thorny remedial issues for future determination.

*Id.* at 726. In other words, if the arbitrators had completed their assignment (as defined by the parties), and it was clear that they had done so, their award would be final and subject to judicial review even it did not resolve the parties' entire dispute. *Id.*; *see also Anderson v. Norfolk & W. Ry. Co.*, 773 F.2d 880, 883 (7th Cir. 1985) ("To be considered 'final,' an arbitration award must be intended by the arbitrator to be his complete determination of every issue submitted to him."). As stated above, in this case it is not at all clear that the arbitrators completed their assignment when they made the Phase I ruling. To the contrary, it is evident that the panel contemplated conducting further proceedings to resolve the remainder of the parties' dispute, which they did

17

with the entry of the Phase II award.

The Court is also not persuaded by WellPoint's attempts to analogize this case to the Seventh Circuit's opinions in *Olson* and *McKinney*. In *Olson*, the arbitration panel entered a final award in favor of one of the parties, Wexford, and dismissed Wexford from the arbitration proceeding; although other issues remained in the case, because the order left "nothing further for the arbitration panel to adjudicate between Olson and Wexford," it was final as to the claims raised against Wexford. *Olson*, 397 F.3d at 491. In this case, by contrast, the entry of the Phase I ruling left numerous issues unresolved between WellPoint and John Hancock.

*McKinney* involved two separate arbitrations: the first arbitration involved a grievance filed by the union against three collective business entities, referred to as the Employer, alleging violations of a collective bargaining agreement. *McKinney*, 392 F.3d at 868. In a May 2000 award, the arbitration panel found in favor of the union. *Id.* When the entities failed to comply with the panel's award, the union filed a second grievance against McKinney individually, the owner and operator of the three business entities. *Id.* The panel entered a December 2000 award in favor of the union, concluding that McKinney was personally bound by the collective bargaining agreement and was jointly liable for the obligations imposed by the May 2000 award. *Id.* The Seventh Circuit concluded that McKinney's petition to vacate the first award, filed well beyond the 90-day period, was untimely because the first award was final and subject to judicial review at the time it was entered. *Id.* The Seventh Circuit based its determination on the fact that the May 2000 award "contains none of [the] markers of a nonfinal order," in that the panel had determined liability and imposed a remedy, and had not retained jurisdiction to decide any additional issues. *Id.* at 872. The filing of the second grievance, and the rendering of the second

18

award on separate issues, in no way effected the time for filing a petition to vacate the first award. *Id.*

In this case, unlike in *McKinney*, the Phase I and Phase II rulings stem from the same arbitration demand and together constitute "one comprehensive decision" by the arbitration panel as to the parties' dispute. *See id.* at 870. Thus, while this Court agrees with WellPoint that it must judge the finality of the award in terms of its substance and effect, and not based on hyper-technicalities, *McKinney* and *Olson* do not warrant a determination that the panel's Phase I interim ruling was a final award.

In summary, given the division of the issues in Phase I and Phase II, the events leading up to the two arbitration hearings, and the manner in which the arbitrators chose to draft the Phase I ruling, the Court concludes that the arbitrators did not believe their assignment completed with the issuance of the Phase I ruling. Instead, the panel's Phase I and Phase II rulings constituted one comprehensive award, which became final with the issuance of the Phase II ruling. John Hancock's Cross-Petition to Vacate, filed within 90 days of the Phase II ruling, was therefore timely.

## II. The Panel's Authority to Render an Award

The grounds for challenging an arbitration award are quite limited, reflecting the voluntary, contractual nature of commercial arbitration. *IDS Life Ins. Co.*, 266 F.3d at 649. "Within exceedingly broad limits, the parties to an arbitration agreement choose their method of dispute resolution and are bound by it however bad their choice appears to be either *ex ante* or *ex post*." *Id.* Nevertheless, under 9 U.S.C. § 10(a)(4), the Court must vacate an award where the arbitrators exceeded their power in deciding a case. 9 U.S.C. § 10(a)(4); *R.J. O'Brien & Assoc.*,

*Inc. v. Pipkin*, 64 F.3d 257, 263 (7th Cir. 1995). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). Thus, when an arbitrator has not been duly selected in accordance with the parties' agreement, he has no authority to render an award. *R.J. O'Brien*, 64 F.3d at 263; *Universal Reins. Corp. v. Allstate Ins. Co.*, 16 F.3d 125, 128-29 (7th Cir. 1994). However, a "trivial departure" from the parties' agreement does not bar enforcement of an award. *R.J. O'Brien*, 64 F.3d at 263.

John Hancock argues that because Krishova was not selected in the manner set forth in Section 15.3 of the PSA, the panel had no power to render an award. (R. 37, John Hancock's Cross-Pet. ¶ 34.) Specifically, John Hancock argues that WellPoint had no authority under the PSA to request that Nichols withdraw or to appoint Krishova as a replacement arbitrator, because the 20-day period for appointing an arbitrator under Section 15.3 of the PSA had expired. (*Id.* ¶ 33.) In John Hancock's view, WellPoint's actions render the panel's award a nullity.

## A. Waiver of John Hancock's Argument

As an initial matter, WellPoint argues that John Hancock waived its right to challenge the constitution of the panel by not bringing an immediate action under Section 5 of the FAA at the time Nichols withdrew. (R. 46, WellPoint's Reply at 16-21.) Section 5 of the FAA permits a party to seek court-designation of an arbitrator when there is a vacancy on the panel due to the failure of a party to appoint an arbitrator or for some other reason. That section provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming

of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5. WellPoint argues that if John Hancock had any objection to the constitution of the panel, it was required to avail itself of Section 5 and seek a court-ordered designation of Nichols' replacement before the panel rendered an award. (R. 46, WellPoint's Reply at 18-20.)

In support of this argument, WellPoint relies on the Eighth Circuit's opinion in *Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742 (8th Cir. 2003). In that case, the parties had a dispute about the selection of the neutral umpire, and Dow Corning filed a motion under Section 5 requesting that the district court make the selection. The district court denied the motion, and the Eighth Circuit affirmed, instructing the parties to "select an umpire and get on with the arbitration." *Dow Corning*, 335 F.3d at 749. The parties thereafter selected an umpire. *Id.* One week later, the arbitrator appointed by the other party, Safety, withdrew. *Id.* Dow Corning argued before the remaining panel members that the arbitrator's withdrawal terminated their authority to hear the dispute and that a new panel had to be appointed. *Id.* The panel members disagreed, instead determining that Safety should appoint a substitute arbitrator. *Id.* Dow Corning agreed to proceed before the new panel but with a "reservation of right" to challenge the panel's authority post-award. *Id.* After the panel rendered its award, Dow Corning filed a petition to vacate under Section 10, arguing that the panel lacked authority to enter an award because it was not duly constituted. *Id.* The Eighth Circuit affirmed the district court's denial of Dow Corning's petition. *Id.* In doing so, the Court criticized Dow Corning's decision

21

to await a ruling by the panel rather than file a second motion under Section 5 regarding the substitution of Safety's party-appointed arbitrator. *Id.* at 748-49. The Court then proceeded address, and reject, Dow Corning's argument that the withdrawal of Safety's party-appointed arbitrator meant that the panel had to be reconstituted. *Id.*

WellPoint argues that under *Dow Corning*, "failure to proceed immediately to court pursuant to section 5 results in waiver of any right to seek vacatur of an unfavorable award after the arbitration." (R. 46, WellPoint's Reply at 17.) This Court does not read *Dow Corning* so broadly. Although the Eighth Circuit criticized Dow Corning's failure to bring a second Section 5 motion at the time the vacancy on the panel arose, the opinion does not contain any analysis of why such action would be necessary or required under the FAA. Further, after criticizing Dow Corning for not bringing a Section 5 motion, the Eighth Circuit went on to consider—and reject—Dow Corning's arguments as to why vacatur was required under Section 10. *See Dow Corning*, 335 F.3d at 749. In this Court's view, the Eighth Circuit's comments were less of a definitive holding on waiver than a criticism of what it viewed as gamesmanship on the part of Dow Corning in the circumstances of that case.[5]

Moreover, this Court finds nothing in the FAA to suggest that a challenge to the selection of an arbitrator must be brought immediately under Section 5 or is waived. Sections 5 and 10 of

---

[5] Lending further support to the conclusion that *Dow Corning* did not reach the broad holding WellPoint claims is the Court's reliance on *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668 (5th Cir. 2002). In *Brook*, the Fifth Circuit held that the petitioner had waived his right to challenge the selection of the arbitrators by failing to object during the arbitration process or seek an order challenging the selection process under Sections 4 or 5 of the FAA before proceeding to arbitration. *Id.* at 674. The Court specifically observed, however: "We do not hold that Brook had to exhaust all of the described avenues of objecting to the arbitrator selection process, but . . . he had to make plain and timely his exact objection so that a responsible party—whether the AAA or the arbitrator or a federal court—could have enforced [the parties' agreement]." *Id.*

22

the FAA confer distinct forms of relief: Section 5 authorizes a party to seek judicial relief to fill a vacancy on an arbitration panel, whereas Section 10 allows a party to seek vacatur of an arbitration award on various grounds. There is nothing in the text of the FAA to indicate that either form of relief is mutually exclusive, or that an action under Section 5 is somehow a prerequisite to post-award relief under Section 10. Additionally, Section 10 provides that an award must be vacated if one of the grounds for vacatur is established, including that the arbitration panel exceeded its authority. 9 U.S.C. § 10. Seventh Circuit case law holds that under Section 10, an arbitration panel has no authority to render an award if the arbitrators were not properly selected in accordance with the parties' agreement. *R.J. O'Brien*, 64 F.3d at 263; *Universal Reins. Corp.*, 16 F.3d at 128-29; *Tamari v. Conrad*, 552 F.2d 778, 781 (7th Cir. 1977). Under the law of this Circuit, the Court finds no basis for holding that a challenge to the selection of an arbitrator must have been raised in a Section 5 proceeding or it cannot be raised in a Section 10 petition to vacate. Although the failure to make a timely objection to a defect in the selection process during the arbitration proceeding constitutes a waiver of the right to raise that argument in court, *see Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1263-64 (7th Cir. 1992), in this case John Hancock repeatedly objected to Nichols' withdrawal and the appointment of the replacement arbitrator. (R. 46, WellPoint's Reply, Appendix, Exhibits 2, 9 & 31.) The Court therefore rejects WellPoint's argument that John Hancock waived its right to

23

challenge the constitution of the arbitration panel.[6]

## B. Selection of the Substitute Arbitrator

With these threshold matters resolved, the Court reaches the issue at the heart of this case: Whether the panel lacked authority to render an award because the arbitrators were not duly selected in accordance with Section 15 of the PSA. "Selection of the decision maker by or with the consent of the parties is the cornerstone of the arbitral process." *Lefkovitz v. Wagner*, 395 F.3d 773, 780 (7th Cir. 2005). Further, arbitration agreements are to be enforced by their express terms, even if the results seem harsh or inefficient. *Universal Reins. Corp.*, 16 F.3d at 129. "To substitute our notion of fairness in place of the explicit terms of [the parties'] agreement would deprive them of the benefit of their bargain just as surely as if we refused to enforce their decision to arbitrate." *Id.* at 130. In interpreting the arbitration agreement, the parties' intent is the primary focus, and "as with any other contract, the written agreement itself is the best evidence of what the parties intended." *Id.* at 129.

Here, the PSA provides that the arbitration panel is to be comprised of three members—one arbitrator appointed by each party and a neutral umpire. (R. 35, WellPoint's Sec. Amend. Pet., Exhibit C § 15.3.) The PSA sets forth a process for selecting the arbitrators, and requires the initial selection to be made within 20 days of the arbitration demand. (*Id.*) The PSA

---

[6] Because the Court finds no basis in the law for WellPoint's argument on waiver, the Court does not reach John Hancock's judicial estoppel argument. (*See* R. 48, John Hancock's Reply at 20-21.) The Court notes, however, that WellPoint's attorney argued before the arbitration panel that John Hancock would have an opportunity to challenge the selection of the panel in a post-award petition—the opposite of what it argues here. (R. 49, Leimkuhler Reply Decl., Ex. B at 65 ("No matter who the arbitrator is, there will be a reservation of rights by Hancock. They will have an opportunity at the end of the case, if they don't like the award, to challenge the award on the basis the panel was improperly chosen. They have a remedy.").)

24

further provides that in the event a party fails to make an election within 20 days, "the party demanding such arbitration may appoint the second arbitrator before entering upon arbitration." (*Id.*) The PSA does not, however, contain any provisions addressing what should occur if a duly appointed arbitrator resigns. (*Id.*)

Although the law is clear that an arbitrator selected in a manner that violates the express terms of the parties' agreement has no authority to render an award, there is a dearth of case law addressing the precise issue presented here: whether the panel has authority to render an award when an arbitrator has been duly selected by a party but subsequently withdraws, and the arbitration agreement does not expressly provide for this contingency. Two judges from this District have grappled with analogous situations, and the Court finds their analysis instructive.

In *Evanston Ins. Co. v. Kansa Gen. Int'l Ins. Co. Ltd., et al.,* No. 94 C 4957, 1995 WL 23063 (N.D. Ill. Jan. 13, 1995), which involved a reinsurance dispute, the arbitration agreement provided that each party was to nominate a disinterested arbitrator within 90 days, and the two arbitrators would then choose a third. *Id.* at *1. The agreement further provided that in the event either party failed to timely designate an arbitrator, the party requesting arbitration had the right to designate both arbitrators. *Id.* at *2. Both parties timely appointed arbitrators, but prior to the arbitration hearing, the arbitrator appointed by one of the parties, Kansa, withdrew. *Id.* Kansa proposed a replacement arbitrator, but the other party, Evanston, argued that the right to appoint the second arbitrator had passed to it under the default provision in their agreement. *Id.* District Judge Nordberg disagreed, concluding that the agreement did not speak to the precise issue at hand, but only provided that the right to appoint the second arbitrator passed to the other party in the case of a party's *inaction* with respect to the initial nomination of an arbitrator. *Id.* at *3.

The court did not view an arbitrator's resignation as the type of inaction contemplated by the agreement that would trigger the other party's right to appoint both arbitrators. *Id.* In the absence of a direct provision governing the situation of an arbitrator's resignation, the court looked to the intent of the parties, as evidenced by the agreement. *Id.* The court concluded that the overriding intent of the parties was to submit their dispute to arbitration before a three-arbitrator panel, with each party nominating one arbitrator. *Id.* The court effectuated that intent by allowing Kansa to designate a replacement arbitrator. *Id.*

Similarly, in *Argonaut Midwest Ins. Co. v. Gen. Reins. Corp.*, No. 96-6437, 1998 WL 474142 (N.D. Ill. Aug. 6, 1998), which also involved a reinsurance dispute, the parties' arbitration agreement provided that each side was to appoint an arbitrator within a designated period, and the two arbitrators would then choose an umpire. *Id.* at *1. The agreement specified the qualifications for the arbitrators, including that they be officials of an insurance or reinsurance company. *Id.* The agreement further provided that if either party failed to timely choose an arbitrator, the other party had the right to choose both arbitrators. *Id.* Each party timely appointed an arbitrator, but prior to the selection of the umpire, General Re's arbitrator retired and thus was no longer an active official of an insurance or reinsurance company. *Id.* Argonaut raised an objection, arguing that the arbitrator's retirement rendered him unqualified, and demanded that General Re appoint a replacement arbitrator within thirty days. *Id.* When General Re did not do so, Argonaut purported to appoint a second arbitrator under the default provision of the agreement. *Id.* District Judge Coar rejected Argonaut's interpretation of the agreement, concluding that the arbitrator's retirement was not the type of inaction by a party contemplated by the agreement that would trigger the other parties' right to appoint both

arbitrators. *Id.* at *2-3. The court also found Argonaut's suggested approach untenable in the context of complex commercial arbitrations, noting that it is not uncommon an arbitrator may become unqualified or otherwise unable to serve during the course of a lengthy arbitration proceeding. *Id.* The court noted, however, that if the parties had specified in the agreement that the right to appoint both arbitrators was triggered anytime a party's arbitrator became unable to serve, the court would have been bound to enforce the agreement, no matter how inefficient the result. *Id.* at *3. However, in the absence of a specific provision governing that contingency, the court looked to the general intent of the parties, which was that each of them be allowed to appoint an arbitrator to the panel. *Id.* Thus, the court permitted General Re to appoint a replacement arbitrator. *Id.*

The analysis of these courts leads this Court to conclude that the selection of the replacement arbitrator to fill the vacancy created by Nichols' resignation did not violate the PSA. As stated above, the PSA does not specifically provide for the contingency of an arbitrator's withdrawal. Under the PSA a party forfeits its right to choose an arbitrator if the party fails to appoint an arbitrator within the initial 20-day period following the arbitration demand. There was no such inaction by WellPoint in this case. John Hancock urges an interpretation of the agreement that would prohibit either party from ever choosing an arbitrator after the expiration of the initial 20-day period, but the Court finds this an untenable reading of the parties' agreement. The parties could have specified what should occur in the event of a resignation or inability to serve by one of the arbitrators, and the Court would have been required to enforce that provision. *Universal Reins. Corp.*, 16 F.3d at 129. However, they did not do so.

In the absence of an express term in the agreement governing the contingency involved in this case, the Court looks to the general intent of the parties, as evidenced by their agreement. *See Universal Reins. Corp.*, 16 F.3d at 129; *Argonaut Midwest Ins. Co.*, 1998 WL 474142, at *2; *Evanston Ins. Co.*, 1995 WL 23063, at *3. The PSA evidences the parties' intent that the arbitration proceed before a panel comprised of one arbitrator chosen by each party and a neutral umpire. (R. 35, WellPoint's Sec. Amend. Pet., Exhibit C § 15.3.) That is what occurred here. Further, the selection of the replacement arbitrator was made through a lengthy process in which John Hancock had significant input. Although John Hancock objected to the replacement of Nichols, it agreed that Krishova met the prerequisites for service as WellPoint's party-appointed arbitrator. (R. 46, WellPoint's Reply, Appendix, Exhibit 31.) At no time did John Hancock argue that the entire panel should be disbanded and reconstituted; John Hancock's proposal was that it should be permitted to select Nichols' replacement because Nichols' withdrawal triggered the default provision contained in the PSA. (*Id.*, Exhibit 2.) As stated above, the Court finds no basis in the PSA for this interpretation.

John Hancock further argues that WellPoint should not have been permitted to appoint a replacement arbitrator since it played a role in Nichols' resignation. John Hancock does not address what the PSA would require if Nichols had resigned for some other reason, such as illness or other inability to serve, but states that in such a situation "a party seeking to appoint a

replacement at least would be in a more sympathetic position."[7] (R. 48, John Hancock's Reply at 8.) The Court does not view it as a matter of "sympathy" but of the parties' intent, as evidenced by their agreement. *Universal Reins. Corp.*, 16 F.3d at 129. As stated above, the PSA does not address the contingency of an arbitrator's withdrawal (regardless of the reason), but the general intent of the parties was that they each be permitted to appoint an arbitrator.

WellPoint's role in Nichol's resignation is indeed a complicating circumstance, but nevertheless, the Court cannot discern any specific wrongdoing by WellPoint. WellPoint made clear to the panel that it was fully aware it had no right to remove Nichols, and that whether to remain on the panel was entirely Nichols' decision. (R. 46, WellPoint's Reply, Appendix, Exhibits 1, 7.) John Hancock argues that WellPoint was pressuring Nichols to withdraw in *ex parte* communications, but as previously noted, John Hancock acknowledges that the parties were permitted to have *ex parte* communications with their appointed arbitrator. (R. 39, Leimkuhler Decl. ¶ 21.) After discussions with the parties in which it was determined that Nichols' withdrawal would not affect the arbitration schedule, Nichols decided to withdraw, and

---

[7] The Court notes that one of the treatises John Hancock relies on in its briefs directs that substitution rather than reconstitution of the panel is the appropriate course when a panel member resigns due to illness. Thomas H. Oehmke, COMMERCIAL ARBITRATION § 71.14 (3d ed. 2003) ("Even where an arbitration has been pending for more than one year and an arbitrator resigns (due to illness) before an award is rendered, appointing a replacement is the appropriate course."). Although the treatise does not directly address the situation raised in this case, the Court finds it instructive.

the panel accepted his resignation.[8] (R. 46, WellPoint's Reply, Appendix, Exhibit 1.) It is an arbitrator's prerogative to resign his post if he determines it is in the best interests of the parties to do so. *Florasynth, Inc. v. Pickholtz*, 750 F.2d 171, 174 (2d Cir. 1984); *Evanston*, 1995 WL 23063, at *4; *see also* 1 Larry E. Edmonson, DOMKE ON COMMERCIAL ARBITRATION § 24:1 (3d ed. 2003) ("Arbitrators have an unqualified right to resign and cannot be forced by the courts to continue to serve if they are unwilling to do so . . . ."). WellPoint fully cooperated in the panel's effort to fill the vacancy created by Nichols' resignation in a fair manner; WellPoint's first two choices for a replacement were rejected, and it ultimately agreed to appoint an arbitrator who had been suggested by the remaining panel members.

To the extent John Hancock is arguing that the replacement process was unfair because Krishova was suggested to WellPoint during an *ex parte* communication with the panel members, the Court finds little merit to this argument. (R. 48, John Hancock's Reply at 4.) John Hancock agreed to the *ex parte* communication, and there is nothing in the record to indicate that it raised an objection during the arbitration process that the communication went beyond what counsel had agreed to and was thus improper. (*See* R. 46, WellPoint's Reply, Appendix, Exhibits 28-30.) Further, the *ex parte* discussion did not involve any decisions made in John Hancock's absence; the panel merely made suggestions to WellPoint as to potential replacement arbitrators, including Krishova, no doubt in an effort to move the case along in the face

---

[8] The Court does not agree with WellPoint that we must defer to the panel's decision to allow Nichols to withdraw and WellPoint to appoint a replacement arbitrator. (R. 46, WellPoint's Reply at 21-25.) Even assuming the panel made such a definitive decision, which is not at all clear from the record, the panel had no authority to render an award if it was not duly constituted. *R.J. O'Brien*, 64 F.3d at 260. Further, an arbitrator "is not the judge of his own authority." *Int'l Ass'n of Machinists Lodge No. 1000 v. Gen. Elec.*, 865 F.2d 902, 904 (7th Cir. 1989).

30

objections by John Hancock as to WellPoint's second proposed replacement. (*Id.*, Exhibits 29-30.) WellPoint continued to view its proposed replacement as qualified, but agreed to appoint Krishova instead. (*Id.*, Exhibit 29.) John Hancock fully participated in the process of determining whether Krishova was qualified to serve as an arbitrator, and ultimately agreed that he was qualified. (*Id.*, Exhibit 30-31.) "Parties that opt for arbitration trade the formalities of the judicial process for expertise and expedition associated with arbitration, a less formal process of dispute resolution by an umpire who is neither a generalist judge nor a juror but instead brings to the assignment knowledge of the commercial setting in which the dispute arose." *Lefkovitz*, 395 F.3d at 780. In the context of this commercial arbitration, the Court finds harmless the *ex parte* communication in which Krishova was suggested by the panel as a potential replacement. *See id.* (alleged improprieties by arbitrator, including engaging in *ex parte* communications, "were harmless in the setting of a voluntary arbitration.")

John Hancock further argues that vacatur is warranted pursuant to the court's analysis in *Ass'n of Flight Attendants, AFL-CIO v. Aloha Airlines, Inc.*, 158 F. Supp. 2d 1200, 1207-08 (D. Haw. 2001), but this Court finds that case distinguishable. (R. 48, John Hancock's Reply at 6.) *Aloha Airlines*, which arose from an arbitration conducted pursuant to the Railway Labor Act ("RLA"), involved an unusual set of facts. After a panel of three arbitrators conducted a hearing on the plaintiff's grievance pursuant to a collective bargaining agreement ("CBA"), one of the arbitrators withdrew. *Aloha Airlines*, 158 F. Supp. 2d at 1202-03. Apparently in disagreement about how to proceed, the two remaining panel members each issued separate opinions, one ruling against plaintiff and one ruling in plaintiff's favor. *Id.* The union objected to these unilateral decisions, and in response the RLA System Board of Adjustment appointed a third

31

arbitrator to replace the one who had withdrawn. *Id.* The substitute arbitrator then reviewed the record and, without any input from the two other panel members, issued a "concurrence" in the decision to deny plaintiff's grievance. *Id.* The union filed a complaint in federal court, alleging that the arbitration did not comport with the RLA. *Id.* The district court agreed, concluding, "The integrity of the entire arbitration process here has been fundamentally called into question and is fatally defective." *Id.* at 1208. Specifically, the court held that the plaintiff was entitled to have her grievance resolved by "arbitrators who participated in the hearing, not those merely appointed after the fact." *Id.* at 1207.

As is apparent from the above, *Aloha Airlines* is not on point. Most significantly, in this case the replacement arbitrator, Krishova, was appointed *prior* to the arbitration hearing, heard all of the evidence, and fully participated in the deliberations and rendering of the panel's decision. The procedural irregularities that caused the District Court concern in *Aloha Airlines* did not occur in this case. Thus, the Court does not find *Aloha Airlines* persuasive authority for granting John Hancock's Cross-Petition to Vacate.

In summary, the Court concludes that Nichols' resignation and the appointment of Krishova did not deprive the panel of authority to render an award. Accordingly, John Hancock's Cross-Petition to vacate is denied. There being no basis to vacate the award under Section 10 of the FAA, the panel's award is confirmed. 9 U.S.C. § 9; *Mattel*, 128 S. Ct. at 1402.

## CONCLUSION

For the reasons stated above, John Hancock's Cross-Petition to Vacate Arbitral Award (R. 37) is denied, and WellPoint's Second Amended Petition to Confirm Arbitral Awards (R. 35) is granted. The arbitration panel's award, comprised of the Phase I and Phase II rulings, is confirmed. The Clerk of the Court is directed to enter a final judgment in favor of WellPoint.

ENTERED:

Ruben Castillo
United States District Judge

Dated: April 24, 2008

33